RECORD NO. 14-4002

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ALAN McNEIL JONES,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT CHARLOTTESVILLE

**OPENING BRIEF OF APPELLANT
ALAN McNEIL JONES**

David L. Heilberg
DYGERT, WRIGHT, HOBBS
 & HEILBERG, PLC
675 Peter Jefferson Parkway, Suite 190
Charlottesville, Virginia 22911
(434) 979-5515 Telephone
dheilberg@charlottesvillelegal.com

*Counsel for Appellant*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

## TABLE OF CONTENTS

Table of Authorities ............................................................................ ii

Statement of Jurisdiction................................................................... 1

Statement of the Issues..................................................................... 2

Statement of the Case....................................................................... 2

Statement of Facts ............................................................................ 3

Summary of Argument...................................................................... 7

Standard of Review .......................................................................... 7

Argument.......................................................................................... 7

  1a)  The Court plainly erred in its calculation of the Sentencing
      Guidelines for Jones................................................................... 7

  1b)  In the alternative, the Court plainly erred by refusing to consider a
      Separate downward departure or variance for Jones before reducing his
      Sentence as moved for by the Government ..................................... 14

Conclusion ....................................................................................... 23

Request for Oral Argument............................................................... 24

Certificate of Compliance ................................................................ 24

Certificate of Service ....................................................................... 25

# TABLE OF AUTHORITIES

## Cases

**Gall v. U.S.**, 552 U.S. 38, 128 S. Ct. 586,
169 L. Ed. 2d 445 .................................................................................*passim*

**Kimbrough v. U.S.**, 552 U.S.85, 128 S. Ct. 558 (2007) ...................................8, 13

**Paroline v. U.S.,** 2014 U.S. LEXUS 2936, (U.S. Apr. 23, 2014).........................10

**Rita v. U.S.**, 551 U.S. 338, 127 S. Ct. 2456 (2007) ......................................8, 14, 23

**U.S. v. Carter,** 530 F.3d 565 (7th Cir. 2008)............................................................20

**U.S. v. Dallman,** 533 F.3d 755 (9th Cir. 2008)........................................................18

**U.S. v. Diosdado-Star,** 630 F.3d 359, (4th Cir. 2011) ...........................................19

**U.S. v. Escamilla**, 509 Fed. Appx. 254, 2013 U.S. App.
LEXIS 305 (4th Cir. 2013) ......................................................................................6, 9

**U.S. v. Evans,** 526 F. 3d 155 (4th Cir. 2008) .........................................................14

**U.S. v. Garcia,** 497 F.3d 964 (9th Cir. 2007) .........................................................20

**U.S. v. Hampton,** 441 F.3d 284 (4th Cir. 2006)...................................................8, 22

**U.S. v. McBride**, 434 F.3d 470 (6th Cir. 2006) .......................................................21

**U.S. v. McManus**, 734 F.3d 315 (4th Cir. 2013)....................................................8, 9

**U.S. v. Menyweather**, 447 F.3d 625 (9th Cir. 2006)...............................................21

**U.S. v. Mohamed**, 459 F.3d 979 (9th Cir. 2006) ....................................................19

**U.S v. Monte-Flores**, 736 F.3d 357 (4th Cir. 2013) ......................................8, 9, 19

**U.S. v. Moreland**, 437 F.3d 424 (4th Cir. 2006) ....................................................21

ii

**U.S. v. Munoz-Nava**, 524 F.3d 1137 (10th Cir. 2008)............................20

**U.S. v. Schroeder**, 536 F.3d 746 (7th Cir.2008).....................................19

**U.S.v.Thurston**, 456 F.3d 211 (1st Cir. 2006).......................................21

Statutes, Rules  and Treatises

18 USC § 1028 ...................................................................................2, 3, 12

18 USC § 3231 ................................................................................................1

18 USC § 3553 ......................................................................................*passim*

18 USC § 3742 ................................................................................................1

28 USC § 1291 ................................................................................................1

United States Sentencing Guidelines

USSG § 2B1.1..........................................................................................8, 11, 12

USSG § 2B1.6..............................................................................................12

USSG § 2T1.1..............................................................................................11

USSG § 2T4.1..............................................................................................11

USSG § 5H1.4..............................................................................................20

USSG § 5H1.6........................................................................................21, 22

USSG § 5K1.1....................................................................................6, 7, 12, 17

USSG § 5K2.13............................................................................................20

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

                Appellee

v.                                        14-4002

ALAN McNEIL JONES,

                Appellant-Defendant

On Appeal from the United States District Court
for the Western District of Virginia
Charlottesville Division (Hon. Norman K. Moon)

———————————

**BRIEF OF THE APPELLANT**

———————————

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this federal criminal case pursuant to 18 USC § 3231. This appeal is from a final sentencing of the district court entered on December 16, 2013. (JA 115-120)[1] Appellant ("**Jones**") filed his notice of appeal in the district court on December 30, 2013. (JA 121) Jurisdiction is based on 28 USC § 1291 and 18 USC § 3742(a).

1

## STATEMENT OF ISSUES

Whether the District Judge abused his discretion calculating the Federal Sentencing Guidelines and in refusing to consider additional downward departure or variance from the calculation when considering the 18 USC § 3553 factors.

## STATEMENT OF THE CASE

Jones entered a plea of guilty to two related counts of Conspiracy to commit identification fraud, in violation of 18 U.S.C. § 1028(a)(2) and § 1028(b)(1), and aggravated identity theft, in violation of 18 U.S.C. § 1028A, on September 4, 2013. (JA 8-40) The trial court after considering a Pre-Sentence Investigation Report ("**PSIR**"), on December 16, 2013, sentenced Jones to a 60 months term of imprisonment (JA 55-114, 115-120).    In sentencing, the Court followed the recommendation of the PSIR to find a sentence range of 70-87 months plus 24 months mandatory minimum for a total sentencing between 94 and 111 months before accepting the Government's recommendation for downward departure.  The Court overruled the Defendant's objections asserting that the proper sentencing range was no more than 18-24 or 24-30 months plus 24 months mandatory minimum for a total sentencing range between 42 and 54 months (JA 141-153). This guideline range was less than the 60 months of imprisonment actually imposed after downward departure from the guidelines sought by the Government.

---

[1]  References to the Joint Appendix are denominated "**JA** ___"

2

## STATEMENT OF FACTS

Three co-Defendants, Jones, Mark Gill Bernardo ("Bernardo") and Kelly Erin McPhee ("McPhee") pled guilty to the same two separate offenses charged in a two count Information: conspiracy to commit identification document fraud in violation 18 U.S.C. § 1028(a)(2) and § 1028(b)(1) which carried a possible punishment of 15 years in prison and a fine of up to $250,000 and aggravated identity theft in violation of 18 U.S.C. § 1028A which carried a consecutive mandatory minimum term of two years in prison and a fine of up to $250,000. Jones was the principal in the identity theft offense, and Bernardo and McPhee were aiders and abettors. (JA 128-132)

Each Defendant acknowledged the substantial forfeiture of assets seized by the United States and all of them discussed the Sentencing Guidelines and how they might apply to their cases with their attorneys. (JA 20-22)

Bernardo and McPhee entered into plea agreements with the U.S. Jones entered a "straight" guilty plea without any agreement. Bernard stipulated to certain sentencing guideline factors, including base offense level, an adjustment for loss under the fraud and deceit table, an adjustment for use of sophisticated means and an adjustment for transfer of identification. McPhee's plea agreement was the same as Bernardo's. (JA 24-25)

3

Bernardo and McPhee also voluntarily gave up their right to appeal the guilty verdict and sentence and their right to collaterally attack the judgment at a later date. (JA 25-26)

Without objection from Jones, the Court entered orders of forfeiture to the U.S. surrendering $ 2,116,159.41 in cash or liquid assets plus additional valuable items of property including, but not limited to vehicles, computers and electronic equipment. (JA 122-124)

Jones, McPhee and Bernardo operated a business selling counterfeit drivers' licenses that they manufactured for customers across the United States. Jones started the operation by making fake identification documents in the names of deceased individuals. He made an ID card in the name of Joshua Tucker for himself, and utilized that card to lease a house in Charlottesville. After creating these documents for himself, Jones began making them for others. He would pay commissions to students who helped spread the word about his counterfeit services to customers. The company, called "Novel Design" was publicized solely by word of mouth. Jones used a company in Bangladesh to alter photographs received from the customers for use in the identification documents. Using other foreign vendors, he was able to manufacture very realistic false ID cards for his clients. In order to pay for the services he used a money transfer service called "Money Pack"

4

to accept payment from customers. As his business expanded he chose to transition to an all cash business. (JA 27-32)

McPhee helped the operation by entering customer data into the ID Flow program. She also placed hologram stickers onto the counterfeit driver's licenses and ensured that they appear finished and ready to be delivered. (JA 32-33)

Bernardo joined the two other defendants in 2012. He created a website for the company. Another co-conspirator who was not before the court helped Bernardo. (JA 33-34)

Approximately 25,000 false driver's licenses were manufactured for customers, and the defendants made in excess of 3 million dollars. FBI searched the house finding ample evidence of the operation on May 6, 2013, after posing as undercover buyers of fake identification cards prior to this date. (JA 34-35)

Before sentencing on December 16, 2013, Jones filed objections to the PSIR. The author of the PSIR, Mike Sheffield, conceded that because there was no actual loss as a result of this enterprise, he calculated a "gain" which was estimated to be 2.5 million dollars. (JA 54-63)

Jones also argued that to give the enhancements under the guideline there have to be some facts to support this because the Fourth Circuit is really serious in these cases. If there had been even the most serious kind of accident, or a fatal car accident, the fake ID would have been disclosed very easily, and there would have

5

been a known loss.  The Court responded that if someone with a Fake ID gave someone else a beer and they got into the accident that could have been the loss. Counsel for Jones responded that it is impossible to speculate.  In response to the Court's inquiry if there was anywhere in this pre-sentence report that calculated the sentencing where the enormity of the crime is considered, Jones stated that this was determined mainly by the "loss". (JA 63-66)

Jones argued that a vendor selling alcohol to somebody displaying a fake ID did not suffer a loss,  that the Court's proposed analogy with the loss of hiring an illegal alien and selling alcohol to a minor with a Fake ID did not apply because it was impossible to speculate on the loss.  The Government agreed that the introduction of thousands of false identification cards into the market made it impossible to know what stems from that.  The court concluded that applying the total "gain" was within the holding of "**Escamilla**"[2].  (JA 66-72)

The U.S. filed USSG § 5K1.1motions for substantial assistance for all three defendants because all of them were cooperative.   McPhee came in within days of her arrest and was truthful about her story.   Bernardo was also truthful and forthcoming.  Jones was the last one to talk and while there was hesitation he did tell the truth.  The Court granted the 5K1.1 motion.  (JA 72-82)

_____

[2] Presumably, the Court was referring to the non-binding unpublished immigration fraud decision in **U.S. v. Escamilla**, 509 Fed. Appx. 254, 2013 U.S. App. LEXIS 305 (4th Cir. 2013).

6

The U.S. recommended a 5 year sentence for Jones. (JA 82-97)   At the conclusion of the hearing the Court sentenced Jones to 60 months in Federal prison. (JA 99-103)

## SUMMARY OF ARGUMENT

The trial Court erred at sentencing by overruling objections by Jones as to the application of the Federal Sentencing Guidelines by either improperly performing this calculation or by refusing to depart or grant a variance downward, for the reasons argued by Jones, before imposing his sentence after the Government moved for downward departure from calculated guidelines.

## STANDARD OF REVIEW

The application and consideration by the district court of 18 USC § 3553 factors are reviewed under an abuse-of-discretion standard.[3]

## ARGUMENT and DISCUSSION OF ISSUES

### 1a. The Court plainly erred in its calculation of the Sentencing Guidelines for Jones

Although the Federal Sentencing Guidelines are only one of the statutory sentencing factors to be considered by the Court, it is essential, in performing this calculation, that the Court determines the proper starting point.  The Court must make accurate factual findings under the Guidelines and consider all factors that

---

[3] **Gall v. U. S.**, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007) ("**Gall**").

merit adjustment and downward departure or variance including, but not limited to, the Substantial Assistance Motion.  See **U.S. v. McManus**, 734 F.3d 315 (4th Cir. 2013); **U.S. v. Montes-Flores**, 736 F.3d 357 (4th Cir. 2013).

18 U.S.C. § 3553(a) factors have greater breadth than the Guidelines. See **U.S. v. Hampton**, 441 F.3d 284, 288 n. 2 (4th Cir.2006) ("permissible factors justifying traditional departures differ from—and are more limited than—the factors a [district] court may look to in order to justify a . . . variance."). A non-guideline sentence can be appropriate despite the Guidelines if "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." **Rita v. U.S.**, 551 U.S. 338, 351, 127 S. Ct. at 2465 (2007) ("Rita"); **Kimbrough v. U.S.**, 552 U.S. 85, 113, 128 S. Ct. at 577 (2007) (Scalia concurring).

The 18-point enhancement in 2B1.1(b)(1)(J) based purely on estimated gross revenue of the enterprise, far overstates the true Specific Offense Characteristics. This Court's most recent cases unmistakably require that the sentencing court only apply such significant enhancements to a Base Offense Level where facts are truly proven to justify such increases. **U.S. v. McManus**, 734 F.3d 315 (4th Cir. 2013); **U.S. v. Montes-Flores**, 736 F.3d 357 (4th Cir. 2013).  Here, there were no funds acquired by means of theft or fraudulent procurement and there were no identifiable victims.

8

The PSIR (JA 132, paragraph 24) did not fully quote Application Note 3 (B) which reads as follows verbatim: "***The Court shall use the gain that resulted from the offense as an alternative measure of loss <u>only if there is a loss but it reasonably cannot be determined.</u>***"  Here, there was no loss at all because there were no identifiable victims, there was no fraud as to the customers of the business, and no measurable financial loss to anyone.  The "loss amount table" enhancement (+18) was a misapplication of the Guidelines.  The Court was mandated to use the gain that resulted from the offenses as an alternative measure of loss ***<u>only if there is a loss</u>*** but it reasonably cannot be determined.  Here, there was no loss, only profit that was already almost fully forfeited to the Government.

In terms of gain motivating the Specific Offense Characteristics (JA 132, paragraph 24) the Court's reliance on an unpublished "immigration fraud" case that clearly had broader unquantifiable economic consequences (far beyond underage purchase of alcohol by college students which was the object of this enterprise) was an abuse of discretion.  Compare **U.S. v. Escamilla**, 509 Fed. Appx. 254, 2013 U.S. App. LEXIS 305 (4th Cir. 2013) with **U.S. v. McManus**, 734 F.3d 315 (4th Cir. 2013); **U.S. v. Montes-Flores**, 736 F.3d 357 (4th Cir. 2013).

The sentencing Court further abused its discretion by not reconciling or distinguishing these published decisions with the quite different unpublished decision relied upon.  Unlike logically foreseeable fraudulently procured economic

9

consequences, like the loss of jobs for U.S. citizens to illegal immigrants, the Government here conceded that introduction of thousands of false identification cards into the market made it impossible to know what losses resulted from it. (JA 72) Alcohol purveyors illegally profited financially from this enterprise but there were no losses. The speculative consequences mentioned by the Government, unlike the procurement of jobs illegally that is the primary purpose of immigration fraud, would not be foreseeably and proximately caused by the enterprise.

> [T]o say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result. The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary. It is "a flexible concept," [citation omitted], that generally "refers to the basic requirement that . . . there must be 'some direct relation between the injury asserted and the injurious conduct alleged,'" [citations omitted]. The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. 1 W. LaFave, Substantive Criminal Law §6.4(c), p. 471 (2d ed. 2003) (hereinafter LaFave). Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. See, e.g., ibid.; 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm §29, p. 493 (2005) (hereinafter Restatement). A requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity. [citation omitted].

**Paroline v. U.S.**, ___ U.S. ___, 134 S. Ct. 1710, 1719, 188 L. Ed. 2d 714, 726, (2014).

Rather than measuring the total gain for this clever but illegal enterprise, JA 132, paragraph 18 of the PSIR should have been amended, as suggested by Jones, to use the total estimated tax loss for the Base Offense Level. The amended PSIR stated that there was an unknown amount of state and Federal tax loss. This suggests a more accurate calculation although taxes in full plus a huge penalty were paid as part of the large forfeiture seized by the Government. The sentencing court should have compared, as Jones asked, USSG § 2B1.1(b)(1)(H) to USSG §§ 2T1.1(a)(1) [*Note A requires treatment of tax loss as equal to 28% of unreported gross income*] and 2T4.1(H). The Commission clearly coordinated both calculations of tax loss (easily estimated at more than $400,000 but less than $1,000,000) to yield a consistent Base Offense Level of 20 under either USSG § 2B1.1 or USSG § 2T1.1.

Therefore, by this calculation, USSG § 2B1.1(b)(1)(H) or USSG §§ 2T1.1(a)(1) [*Note A requires treatment of tax loss as equal to 28% of unreported gross income*] and 2T4.1(H) yields a base offense level of 20 before subtracting the 3 points for acceptance of responsibility. Mr. Jones's total Base Offense Level should have been 17 (24-30 months) rather than the unchanged 27 to which the aggravated identity theft consecutive time is added. This yields a Sentencing Guidelines range of between 48 and 54 months.

11

Furthermore, the 2B1.1(b)(11) unauthorized transfer of ID enhancement calculated in the PSIR (JA 133, paragraph 26) does not apply because the 1028A charge itself already accounts for this factor. The 2B1.6 "Aggravated Identity Theft" Application Note titled "Inapplicability of Chapter Two Enhancement" specifically addresses this issue:

> "If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense. A sentence under this guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the Defendant is accountable under 1B1.3."

Therefore, the total base offense level should have been further reduced to 15 which has a sentencing range of between 18 and 24 months that, after the 24 months consecutive mandatory minimum sentence is added, yields a sentence of between 42 and 48 months.

This was the correct guideline from which the Government's motion for downward departure under USSG 5K1.1 should have been reduced.

The **Gall v. U. S.**, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007), and **Kimbrough v. U.S.**, 552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007) decisions do not require judges to find enhancements or aggravators that increase the sentence above the base offense level corresponding to the jury verdict or

guilty plea. Rather, Courts are no longer required to strictly conform to the Guidelines system of ratcheting up the sentence by enhancing it based upon one extra fact after another. The Guidelines serve only as one factor to guide the exercise of judicial discretion and judges should give proper weight to the Guidelines along with all the other statutory factors.

In **Gall**, 128 S. Ct. at 597 (2007), the U.S. Supreme Court instructed sentencing judges to "make an individualized assessment based on the facts presented" with the Guidelines operating as the "initial benchmark" but "not the only consideration."

> "[A] district court must begin "by correctly calculating the applicable Guidelines range." **Gall**, 128 S. Ct. at 596.  Thus, "[t]he sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines." **Rita**, 127 S. Ct. at 2465. But even though the Guidelines are "the starting point and the initial benchmark," they "are not the only consideration." **Gall**, 128 S. Ct. at 596.
>
> Indeed, a district court may not even "presume that the Guidelines range is reasonable." **Id**. at 596-97; see also **Rita**, 127 S. Ct. at 2465. Instead, the district court must "giv[e] both parties an opportunity to argue for whatever sentence they deem appropriate" and "then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." **Gall**, 128 S. Ct. at 596 (emphasis added); see also **Kimbrough**, 128 S. Ct. at 564 (reiterating that the "Guidelines range" is just one of "the array of factors warranting consideration" by the sentencing judge). In each case, the court "must make an individualized assessment based on the facts presented." **Gall**, 128 S. Ct. at 597. A district court may reject a sentence within the advisory Guidelines range because "the case at hand falls outside the 'heartland'" to which the individual Guidelines apply or because a sentence within the Guidelines fails to reflect the

13

other § 3553(a) factors or "because the case warrants a different sentence regardless." **Rita**, 127 S. Ct. at 2465."

**U.S. v. Evans**, 526 F.3d 155, 160-61 (4th Cir. 2008).

The sentence in **Gall** of thirty-six months probation, a punishment based upon the district judge's individualized evaluation of the factors set forth in 18 USC § 3553(a) — particularly rehabilitation — rejected the appellate court's rote application of the Guidelines. Here, in contrast, the Court uncritically ignored and exceeded the tax Guidelines. The sentencing Court's automatic assumption that the mistaken sentencing recommendations were reasonable constituted a now prohibited mandatory application of the Guidelines.

### 1b. In the alternative, the Court plainly erred by refusing to consider a separate downward departure or variance for Jones before reducing his sentence as moved for by the Government

In the alternative, Jones asserted in his objections that applying a much higher Guideline, closer to that referenced in the PSIR, would be error. However, the points listed below provided reasons for either a variance or downward departure that were ignored in the PSIR and the Court's sentencing analysis (JA 138, paragraphs 70 & 71)[4].

---

[4] There is a distinction between departures and variances. Departures are more stringent but mitigating information and the court varying from the guidelines is different. A Defendant need not specifically ask for one or the other but present the mitigating information and the court may vary from the guidelines. Mitigating information is also relevant to where in the guidelines the sentence should fall.

As conceded at JA 132, paragraph 18, there were no identifiable victims in this offense. Jones did not steal from or defraud those who paid him for the identifications. There was no "loss" in this conventional sense to any individual persons. Only the Government, by their huge seizure, ultimately financially benefited in this situation where there is no need for further restitution or repayment of actual loss to victims and unpaid taxes were incorporated into the huge financial penalty in this forfeiture.

Unlike in every other kind of theft, fraud or counterfeiting case ever seen, there was no financial loss to any victims for what was paid (not even to the State Governments that did not issue these counterfeited identifications). All of his customers were willing participants and, except for a few unfilled orders at the time of the arrests, nobody lost any money. Those customers will never complain, of course, because they were willing participants in the fraud and have no interest in disclosing their participation.

The Government basically forfeited almost all profits. Nevertheless, Jones obviously worked hard for the money as he would have if this had been a legitimate enterprise.

The fake IDs, for all practical purposes, were useless once each purchaser of this contraband actually reached age 21 and each license was likely destroyed at that point. Jones went to great effort to assure that these identifications went to

real people supplying their real personal photographs. Culpability for conventional analysis for currency counterfeiting should not have applied either. Counterfeit money circulates in the economy until it is intercepted. In contrast, these counterfeit identifications were presumably exclusively possessed by their owners for a single limited use. Once the owner reached age 21, its efficacy for what it purported to be ended whether or not it was cut up.

This was a one-of-a-kind enterprise. Jones described it as follows:

"I understood the nature of our product demanded great respect so as not to permit identifications to go to the wrong people and I took that responsibility seriously. To that end, we were not an equal opportunity service. We only made our services available to college undergraduates of reputable four-year institutions and we had a zero-tolerance policy for anyone or anything that fell outside of that narrow demographic. Specifically, we did not condone, assist, or participate in the market associated with identity theft, fraud or immigration issues. Furthermore, we did not make our services available to high school or community college students. This information was provided to our customers in writing and we carefully screened where the identifications were sent."

"By employing a combination of privately enforced security measures and publicly stated guidelines, we were able to filter our target market while purposely refusing to send identifications to those who would use the product other than as intended. Some of these measures included: 1) Ordering privileges were restricted to the ".edu" domain only. All other domains (e.g. ".com," ".net," ".org," etc) were blacklisted and automatically barred from future communication; 2) The person ordering was required to use their real name; their legal name according to institutional registration had to match their desired order submission. We searched college websites for each application to be sure that each customer was honestly enrolled at his or her institution of origin consistent with what was stated in applications. Information that did not match was rejected and blacklisted; 3) We

never marketed or advertised our service and maintained no online presence. Our customers found us only by word of mouth; 4) We visually verified all facial images. Suspect orders (appearing too young or too old) were tagged for further investigation or blacklisted outright; 5) We limited the date ranges provided on orders. For example allowing dates of birth aging the client in the 21-22 year range only; 6) Payments were accepted and identifications were manufactured only after every application was screened for compliance with our guidelines in advance; and 7) We restricted order acceptance and shipping to/from the United States only."

Additionally, there was a theoretical risk that, if these identifications fell into the wrong hands, national security concerns might arise. As to this, the Department of Homeland Security looked into this but, based on their investigation, never found anything. The manner in which this enterprise was conducted made a possible mistake in providing identifications to the wrong people to be rare, surprising, unintentional and highly improbable. Jones certainly did not intend this indirect speculative consequence. As was obvious from his military background and his truthful proffer to Homeland Security, that in part formed the basis for the USSG 5K1.1 motion for departure by the Government, nothing like this was intended. Jones did his best to help Homeland Security. His skill and expertise will enable better defenses against real possible future threats. Again, the Court could not speculate as to unlikely theoretical harms.

Jones and his co-defendants screened for the real identities of their consenting customers. When selling the genuine looking licenses, they did not in

17

any way misuse the information to the disadvantage of the real people who willingly bought this product. They used this information exactly as was promised to their customers. The fake dates of birth, presumably, would not matter once the purchaser turned age 21 anyway. While there was speculative potential for isolated harms, this was close to a victimless crime (if there is such a thing).

Except for its amazing profitability resulting from smart creativity, it is hard to figure out who was seriously hurt by their enterprise. Novel Design was a single business entity that was operated in a single location. The ordering process was via email only, cash payments were made by mail and all business activities occurred from a single location within the United States. Business came in only by person-to-person word of mouth.

The huge demand for this product arose because of what might be described as "21st Century Prohibition." Many otherwise honorable citizens were excluded from legally possessing and consuming alcohol by the ever shifting limits of governing laws. Jones and his co-defendants were similar to "speakeasy" operators or "moonshiners". Because of laws that were perceived by many to be unfair, they gave the people what they wanted.

In several circuits the traditional departure analysis is no longer relevant. See e.g. **U.S. v. Dallman**, 533 F.3d 755 (9th Cir. 2008) ("The district court's determination that Dallman's offense conduct was not aberrant behavior and did

18

not merit a downward departure may be encompassed within the district court's assessment of Dallman's "history and characteristics" as set forth in 18 U.S.C. § 3553(a)(1)"); **U.S. v. Mohamed**, 459 F.3d 979, 986 -987 (9th Cir. 2006) ("We think the better view is to treat the scheme of downward and upward "departures" as essentially replaced by the requirement that judges impose a "reasonable" sentence....the concept of formal departures has become anachronistic..."); **U.S. v. Schroeder**, 536 F.3d 746 (7th Cir. 2008) ("Although [t]he concept of departures has been rendered obsolete in post- **Booker** sentencing ... the district court may apply those departure guidelines by way of analogy in analyzing the § 3553(a) factors.").

In any event, even though the district court denied the traditional downward departure based on a certain mitigating factor, it should nevertheless have considered the same factor justifying a downward "variance" and reached the same sentence under the § 3553(a) analysis. See **U.S. v. Montes-Flores**, 736 F.3d 357 (4th Cir. 2013) ("the Supreme Court has directed that "when applying a departure provision or varying from the Guidelines range, the district court must give 'serious consideration to the extent' of the departure or variance, and 'must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.'" **U.S. v. Diosdado-Star**, 630 F.3d 359, 365 (4th Cir. 2011) (quoting **Gall v. U.S.**, 552 U.S. 38, 46, 128 S. Ct. 586, 169 L.

19

Ed. 2d 445 (2007)."); **U.S. v. Carter**, 530 F.3d 565 (7th Cir. 2008) ("The guidelines are but one factor among those listed in 18 U.S.C. § 3553(a), and regardless of whether courts have previously recognized public service as a ground for departure from the Guidelines, sentencing courts are charged with considering as part of the § 3553(a) factors "the history and characteristics of the defendant," which would include a defendant's public service. § 3553(a)(1)); **U.S. v. Garcia**, 497 F.3d 964, 971-72 (9th Cir. 2007) (where Defendant convicted of drug conspiracy, sentence of 100 years vacated in part because district judge erred in holding it had no power to consider to defendant's drug addiction and resulting mental impairment as a mitigating factor under 18 U.S.C. § 3553(a)..."Just because a consideration was improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime."...Fact that guidelines preclude downward departure because of voluntary use of drugs under USSG § 5K2.13 and 5H1.4 does not preclude judge from using same as mitigating factor under § 3553(a)-"We agree with our sister circuits and hold that district courts are not prohibited in all circumstances from considering a defendant's drug addiction in choosing a reasonable sentence."); **U.S. v. Munoz-Nava**, 524 F.3d 1137 (10th Cir. 2008) (rejecting government's argument that district court placed undue weight on defendant's family circumstances and that Guidelines disfavor the consideration of family ties and responsibilities under

20

USSG § 5H1.6 because after **Gall** "factors disfavored by the Sentencing Commission may be relied on by the district court in fashioning an appropriate sentence"); **U.S. v. Thurston**, 456 F.3d 211 (1st Cir. 2006) ("Post-**Booker**, a sentencing judge could well conclude that a . . . discouraged factor did not quite justify a departure from the guidelines . . . but might justify a somewhat shorter sentence under a reasonableness standard."); **U.S. v. McBride**, 434 F.3d 470 (6th Cir. 2006) ("Now, because the Guidelines are no longer mandatory and the district court need only consider them along with its analysis of the § 3553(a) factors, the decision to deny a Guidelines-based downward departure is a smaller factor in the sentencing calculus. Furthermore, many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court - with greater latitude- under section 3553(a)."); **U.S. v. Menyweather**, 447 F.3d 625, 634 (9th Cir. 2006) (9th Cir. 2006)( in $500,000 embezzlement case, even if family circumstances not sufficiently unusual to qualify for traditional downward departure, no abuse of discretion for district court to consider this factor (among others) to depart 8 levels under 3553(a) analysis.

There is no question that a district judge sitting within the Fourth Circuit varies below Guidelines sentences at his or her peril. A Guidelines sentence is presumed reasonable. **U.S. v. Moreland**, 437 F.3d 424, 433 (4th Cir. 2006). A variance sentence, by contrast, is reviewed for both substantive and procedural

21

error. **Id.** at 434. "[T]he farther the Court diverges from the advisory Guideline range the more compelling the reasons for the divergence must be." **Id**. Moreover, the district court's reason for imposing a variance sentence may not contravene the policies stated in the "advisory" Guidelines. See, e.g., **U.S. v. Hampton**, 441 F.3d 284 (4th Cir. 2006) (vacating a downward variance sentence imposed principally out of concern for defendant's small children, noting that family ties are a discouraged factor under USSG § 5H1.6).

This upward bias does not provide any downward structure so that a harsh sentence can be corrected by sensitivity to such factors as the character of the defendant, the possibility of rehabilitation, other mitigating factors, the consequences of an alternative decision and the need to avoid disproportional and disparate sentences. In other words, all the analysis trends upward. There is no structure for how judicial conscience can move downward. The result is a system of ***de facto*** mandatory guidelines.

By ratcheting up the sentence fact by fact, as is typically done under the Guidelines, the sentencing Court arbitrarily chose the Government recommended Guideline. This gave virtually no weight to the other 18 USC § 3553 statutory sentencing factors.  Mitigating factors are "relevant" considerations in the sentencing process, and blind deference to the Guidelines violates the law as it exists post-**Booker**.

Here, the Court, gave no detailed reasons in open court or in writing to justify how sentencing discretion was exercised. This is contrary to the "advisory" nature of the Guidelines and the requirement to consider all statutory sentencing factors in fashioning a sentence "*sufficient, but not greater than necessary*" (emphasis added) to comply with its purposes. This constituted a failure to consider the § 3553(a) factors under **Rita**, 127 S. Ct. at 2468. This procedural error was an abuse of discretion under **Gall**, 128 S. Ct. at 596, that requires re-sentencing.

## CONCLUSION

Jones respectfully requests that the Court summarily reverse the sentence in his case. For these reasons and authorities set forth above, Jones asks this Court to find that his sentence did not adequately consider the factors in 18 USC § 3553(a). This sentence was far greater than necessary to achieve the goals in § 3553(a) (2). Accordingly, Jones respectfully maintains that the Court should remand this case with re-sentencing instructions.

Respectfully submitted,

ALAN JONES
By Counsel

s/David L. Heilberg
David L. Heilberg
*Counsel for Appellant*

23

## **REQUEST FOR ORAL ARGUMENT**

Counsel for appellants asserts that the issues raised in this brief may be more fully developed through oral argument, and respectfully requests the same.

## **CERTIFICATE OF COMPLIANCE**

1.  This brief of the appellant has been prepared using Word software, Times New Roman font, 14 point proportional type size.

2.  EXCLUSIVE of the table of contents, table of authorities, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains <u>5,318</u> words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

Respectfully submitted,
ALAN JONES
By Counsel

<u>s/David L. Heilberg</u>
David L. Heilberg
VSB No. 18750
Dygert, Wright, Hobbs & Heilberg, PLC
675 Peter Jefferson Parkway, Suite 190
Charlottesville, VA 22911
(434) 979-5515 Office
(434) 295-7785 Fax

24

## **CERTIFICATE OF SERVICE**

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this June 11, 2014, filed the required copies of the foregoing Brief of Appellant in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Ronald M. Huber
AUSA for the Western District of Virginia
Suite 104
255 West Main Street
Charlottesville, VA 22902-0000
Email: Ron.Huber@usdoj.gov


s/David L. Heilberg
David L. Heilberg

25